UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Petitioner,

vs.

Michael Digiulio,

        Respondent.         Civ. No. 07-4770 (PJS/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Government's Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release under Title 18 U.S.C. §4246. An Evidentiary Hearing on the Petition was conducted on March 26, 2008, at which time, the Government appeared by David W. Fuller, Assistant United States Attorney, and

the Respondent Michael Digiulio appeared personally, and by Katherine M. Menendez, Assistant Federal Defender.[1]

For reasons which follow, we recommend that the Petition be granted, that the Respondent be committed to the custody of the Attorney General, and that the Attorney General hospitalize the Respondent at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester"), for care and treatment, as "suitable arrangements for State custody and care of [the Respondent] are not available." Title 18 U.S.C. §4246(a).

## II.  Factual and Procedural Background

The Respondent is Federal prisoner, who is currently being detained at FMC-Rochester, pursuant to an Order dated March 8, 2007, that was issued by the United States District Court for the Eastern District of Pennsylvania, and that committed the Respondent to the custody of the Attorney General pursuant to Title 18 U.S.C. §§4241(d), and 4244(a).  See, Government Exhibit A, Docket No. 3.  The Respondent had pled guilty to an Assault on a Veterans Administration ("VA") nurse, but the

---

[1]At the close of the Hearing, the Respondent requested leave to submit a post-Hearing memorandum on the legal issues raised by the Petition.  Leave was granted, however, by letter dated April 2, 2008, counsel for the Respondent advised that she would not be submitting any post-Hearing memoranda, see, Docket No. 14, and accordingly, we took the matter under advisement on that date.

Court ordered a competency evaluation, so as to determine whether the Respondent

could proceed to sentencing given his mental state.  See, <u>Government Exhibit A</u>, supra

at 1-2.  As a consequence, the Respondent was transferred from the Federal Detention

Center, in Philadelphia, Pennsylvania ("FDC-Philadelphia"), to FMC-Rochester,

where he was admitted on May 8, 2007, for the treatment of his mental disease,

pursuant to Title 18 U.S.C. §4244; for an evaluation of his competency to proceed

with sentencing, pursuant to Title 18 U.S.C. §4241; and for an evaluation of his

present mental condition and dangerousness, pursuant to Title 18 U.S.C. §4246(a).

See, <u>Government Exhibit A</u>, supra at 2-3.[2]

On July 16, 2007, following an evaluation which included a personal interview

of the Respondent, a presentation by his treatment team, and a review of his medical

records, a Risk Assessment Panel (the "Panel") at FMC-Rochester unanimously

concluded that the Respondent met the requirements for continued commitment, under

Title 18 U.S.C. §4246(a).  See, <u>Government Exhibit B</u>, <u>Docket No. 3</u>.[3]  Accordingly,

---

[2]Since the Respondent has now served more time within the Bureau of Prisons than any potential sentence for his Assault conviction, FMC-Rochester concluded that "the issue of competence for sentencing is apparently moot[.]"  See, <u>Government Exhibit B</u>, <u>Docket No. 3</u>, at 1.

[3]The Risk Assessment Panel was comprised of the following members: 1)
(continued...)

on October 22, 2007, the Warden of FMC-Rochester submitted a Certificate to the Clerk of Court, for the United States District Court of the District of Minnesota, as required by Title 18 U.S.C. §4246(a), in order to stay the Respondent's release, until a Hearing could be conducted. See, <u>Government Exhibit C</u>, <u>Docket No. 3</u>. Thereafter, on December 5, 2007, the Government filed a Petition, in which it requested a Hearing to determine the Respondent's present mental condition, as contemplated by the statute. See, <u>Petition</u>, <u>Docket No. 1</u>. As noted above, a Hearing on the Petition was conducted on March 26, 2008, at FMC-Rochester.[4]

At the time of the Hearing,[5] Andrew M. Simcox, Ph.D., ABPP ("Dr. Simcox"), who is a licensed and Board-certified forensic psychologist, a diplomate of the American Board of Forensic Psychology, and the Chief of Psychology at FMC-

---

[3](...continued)
Andrew Simcox, Ph.D., ABPP, Chief of Psychology at FMC-Rochester; 2) Daniel J. Shine, Jr., M.D., Staff Psychiatrist at FMC-Rochester; and 3) Daniel Carlson, Psy.D., Staff Psychologist at FMC-Rochester. See, <u>Government Exhibit 5</u>.

[4]Originally, we had scheduled the Hearing for January 23, 2008, but, in view of the voluminous records involved, we granted the Respondent's Motion for a Continuance, without objection from the Petitioner. See, <u>Docket Nos. 9 and 10</u>.

[5]At the time of the Hearing, the Government offered a total of fourteen (14) Exhibits, and all were received without objection.

Rochester, testified.[6]  Dr. Simcox attested that he has overseen the Respondent's

treatment since the Respondent's arrival at FMC-Rochester, on May 8, 2007, and that

he served as part of the Panel, which ultimately concluded that the Respondent met

the requirements for continued commitment, pursuant to Title 18 U.S.C. §4246(a).

As part of its assessment, Dr. Simcox testified that the Panel conducted a

personal interview of the Respondent, reviewed his medical records, and obtained

information from his treatment team.  After gathering this information, Dr. Simcox

testified that the Panel met to discuss the Respondent's case, and to prepare its Report.

In its Report, the Panel observed that the Respondent had joined the United States

Marine Corps in 1973, but was honorably discharged for medical reasons in 1974,

following a hospitalization for symptoms of psychosis.  See, Government Exhibit 5,

at 1.  At that time, the Respondent was diagnosed with Schizophrenia, Paranoid Type.[7]

---

[6]The Respondent stipulated to Dr. Simcox's expertise, and we concur in the
view that he has the requisite training, education, and experience, to offer competent
psychological diagnoses, prognoses, and opinions.  See, Government Exhibit 4.

[7]The Diagnostic and Statistical Manual of Mental Disorders, Fourth Revision,
Text Revision ("DSM-IV-TR"), at p. 313, describes Schizophrenia, Paranoid Type,
as follows:

> The essential feature of the Paranoid Type of Sxhizophrenia
> is the presence of prominent delusions or auditory

(continued...)

Id.  Between 1980 and 2004, the Respondent was hospitalized more than twenty (20) times at the VA hospital in Coatesville, Pennsylvania ("VA-Coatesville"), on both a voluntary and an involuntary basis.  Id. at 1-2.

In reviewing the Respondent's medical records, the Panel noted that, in 1995, the Respondent sought admission at VA-Coatesville on several occasions, sometimes while intoxicated, and once while complaining that he was being chased by a "monster who was riding with the Hell's Angels."  Id. at 2; see also, Government Exhibit 2, at 651-55.  The Respondent was discharged the following day, with the discharge summary reflecting his history of assaultive behavior toward staff and other

---

[7](...continued)
> hallucinations in the context of a relative preservation of cognitive functioning and affect. * * * Delusions are typically persecutory or grandiose, or both, but delusions with other themes (e.g., jealousy, religiosity, or somatization) may also occur.  The delusions may be multiple, but are usually organized around a coherent theme.  Hallucinations are also typically related to the content of the delusional theme.  Associated features include anxiety, anger, aloofness, and argumentativeness. The individual may have a superior and patronizing manner and either a stilted, formal quality or extreme intensity in interpersonal interactions.  The persecutory themes may predispose the individual to suicidal behavior, and the combination of persecutory and grandiose delusions with anger may predispose the individual to violence.

patients. Id. On May 21, 1999, the Respondent was again admitted, for "confusion, hallucinations, agitation and refusal to take psychiatric medications." Id. In the four (4) years between these admissions, the Respondent had resided at Arbor Court Personal Care Home, in Media, Pennsylvania, which VA-Coatesville staff described as his "longest time * * * in the community." Id.; see also, Government Exhibit 2, at 647-50. The Respondent was discharged from VA-Coatesville on June 4, 1999. Id.

From September 22, through October 29, 1999, the Respondent was again hospitalized at VA-Coatesville, after he presented with symptoms of "delusions, grandiose and sexual overtone, and agitated behavior, marked by throwing chairs, tearing up lamp, threw clothes all over in his room, stuffed up toilet, let the bathroom water flood, mumbling that two girls inside of him were trying to cut him up." Id.; see also, Government Exhibit 2, at 644-47. He was again hospitalized, from February 8, through April 20, 2000, "after he stole an ambulance from [a hospital] and drove to [VA-Coatesville] and requested admission," claiming that he was "raped 1,000 times" and was "given the wrong medication." Id.; see also, Government Exhibit 2, at 640-44. During that admission, the Respondent "was placed in four-point restraints after threatening nursing staff." Id.; see also, Government Exhibit 2, at 642.

The Respondent was again hospitalized at VA-Coatesville, from July 18, through July 31, 2003, from August 5, through December 3, 2003, from February 5, through March 2, 2004, from March 1,1 through May 27, 2004, and from September 14, through September 29, 2004. Id.; see also, Government Exhibit 2, at 631-38. On each occasion, he was showing signs of delusion, hallucinations, and agitation, and, on one occasion, he reported that he was "suicidal-homicidal." Id. During his hospitalization in September of 2004, the Respondent physically assaulted a nurse, and an elderly male patient, without provocation. Id.; see also, Government Exhibit 2, at 630. The Respondent "approached a male nurse without warning and proceeded to strike him in the head several times with a closed fist." Id. at 4; see also, Government Exhibit 2, at 630. The nurse "suffered a broken tooth and injuries to his head, shoulder, neck, and back," and was placed on traumatic leave. Id.; see also, Government Exhibit 2, at 630.

As a result of that incident, the Respondent was charged with Assault, leading to his incarceration at FDC-Philadelphia as a pre-trial detainee. Id. at 3; see also, Government Exhibit 1, at 17. While attending a Hearing for the offense, the Respondent "flipped over a table in the courtroom." Id. at 4. The Respondent's discharge summary, from VA-Coatesville, indicated a "poor to guarded" prognosis,

- 8 -

given the Respondent's "tendency to relapse into a psychotic state and episodically to act on the basis of delusions of persecution and experiencing auditory hallucinations from time to time, despite treatment with both newer antipsychotic medications, as well as more traditional ones, and a whole range of therapeutic modalities made available to him[.]"  Id. at 2; see also, Government Exhibit 2, at 631.

Upon his arrival at FDC-Philadelphia, the Respondent was diagnosed with Schizoaffective Disorder.[8]  See, Government Exhibit 6.  In his testimony at the Hearing, Dr. Simcox explained that Schizoaffective Disorder encompasses symptoms

---

[8]DSM-IV-TR, at p. 319, describes Schizoaffective Disorder, as follows:

> The essential feature of Schizoaffective Disorder is an uninterrupted period of illness during which, at some time, there is a Major Depressive, Manic, or Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia (Criterion A).  In addition, during the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms (Criterion B).  Finally, the mood symptoms are present for a substantial portion of the total duration of the illness (Criterion C).  The symptoms must not be due to the direct physiological effects of a substance (e.g., cocaine) or a general medical condition (e.g., hyperthyroidism or temporal lobe epilepsy) (Criterion D).  To meet criteria for Schizoaffective Disorder, the essential features must occur within a single uninterrupted period of illness. * * * For some individuals, this period of illness may last for years or even decades.

- 9 -

of both Schizophrenia, and a major mood disorder -- in the Respondent's case, Bipolar Disorder.[9]   While at FDC-Philadelphia, the Respondent was "intermittently agitated and lethargic," see, Government Exhibit 5, at 3, and made many delusional statements, including reporting that he worked for the Secret Service and the Central Intelligence Agency; that he owned the State of Delaware; and that "others are with him in his cell and have assaulted him physically and sexually."   Id.; see also, Government Exhibit 3, at 40-41, 72, 80, 102, 104.   He also reported that he was on death row, that "a young Einstein came by his door," see, Government Exhibit 3, at 90, that "he and his family are currently being persecuted by Nazis from WWII and by 'Black Argonauts,'" and that he is "Abraham, and I never died, I've been alive forever[.]" Id. at 96.

--------------------

[9]According to DSM-IV-TR, at p. 321, Schizoaffective Disorder, Bipolar Type, "applies if a Manic Episode or Mixed Episode is part of the presentation," and "Major Depressive Episodes may also occur."   "A Manic Episode is defined by a distinct period during which there is an abnormally and persistently elevated, expansive, or irritable mood," lasting at least one (1) week.   Id. at p. 357.   "The essential feature of a Major Depressive Episode is a period of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities."   Id. at p. 349.   "A Mixed Episode is characterized by period of time (lasting at least 1 week) in which the criteria are met both for a Manic Episode and for a Major Depressive Episode nearly every day[.]"   Id. at p. 362.

On one occasion, when the Respondent's psychologist, Andrea F. Boardman, Ph.D. ("Dr. Boardman"), stopped by his cell at FDC-Philadelphia, he exhibited disorganized thoughts, and warned Dr. Boardman that she should "stay out [of] here if [she] know[s] what's good for [her]." Id. at 43. On another occasion, the Respondent told Dr. Boardman that he would not "accept" her explanations, because the people working on his behalf were "post-war Germans." Id. at 45. Due to the Respondent's recent assaultive behavior, including incidents at FDC-Philadelphia, staff members were alerted to use caution around him. Id. at 33, 35.

In his testimony, Dr. Simcox related that, while incarcerated at FDC-Philadelphia, the Respondent broke a food tray, and then attempted to strike a guard, through his food slot, with one of the shards. See, Government Exhibit 5, at 4; see also, Government Exhibit 1, at 63-65; Government Exhibit 3, at 49-50. Dr. Simcox characterized this as an impulsive act, and testified that the Respondent cut the officer's glove, but did not break his skin. Id. Dr. Simcox related that, in another incident at FDC-Philadelphia, the Respondent reached through his food slot and grabbed a staff member's pants, thereby tearing his pants pocket. Id.; see also, Government Exhibit 1, at 66-68; Government Exhibit 3, at 36-37. Although the staff member was uninjured, Dr. Simcox testified that the Respondent's action carried a

significant risk of injury, given that he could have succeeded in pulling the staff member up against the door, or pulling him in through the food slot.

During his pretrial detention, the Respondent was transferred to the Federal Correctional Institution, in Butner, North Carolina ("FCI-Butner"), on several occasions, for competency evaluations relating to his pending criminal charges.  Id.; see also, Government Exhibit 3, at 63-67, 82-86.  On each occasion, the Respondent was stabilized to competency but, after leaving FCI-Butner's inpatient psychiatric unit, to travel back to FDC-Philadelphia, he quickly became "non-compliant with medications * * * and decompensated back to his original psychotic state."  Id.; see also, Government Exhibit 3, at 34, 56, 59; Government Exhibit 6, at 1.  In fact, the doctors at FCI-Butner, who concluded that the Respondent had achieved competency, specifically stated that their opinion of his competency was "based on [the Respondent's] continued compliance with his medication."  Government Exhibit 3, at 66.

Ultimately, the Respondent was unable to maintain competency for sentencing, and FDC-Philadelphia was unable to find a suitable community-based placement for him.  See, Government Exhibit 6, at 1.  In a report to the Court, on February 26, 2007, Dr. Boardman opined that, if the Respondent "were not housed in a single cell in the

most secure area of the institution with heightened levels of precaution used whenever he is removed from his cell, incidences of violence toward others would be much higher." Id. at 2.  Accordingly, as noted above, on May 8, 2007, the Respondent was transferred to FMC-Rochester, for treatment, and for the evaluation of his present mental condition and dangerousness, pursuant to Title 18 U.S.C. §4246(a).  See, Government Exhibit A, supra at 2-3.

Upon the Respondent's arrival at FMC-Rochester, he was placed in a Special Housing Unit ("SHU"), where he spent 23 hours per day in an individual, locked unit. See, Government Exhibit 5, at 5.  Dr. Simcox attested that the Respondent was actively psychotic at that time, with mood instability.  On May 9, 2007, the Respondent was initially evaluated by Ubaldo Bocanegra, M.D. ("Dr. Bocanegra"), who is a staff psychiatrist at FMC-Rochester.  See, Government Exhibit 7.  The Respondent told Dr. Bocanegra, "I've been violent for a long time and I don't know why."  Id. at 1.  Dr. Bocanegra confirmed the Respondent's diagnosis of Schizoaffective Disorder, Bipolar Type, and he requested a Due Process Hearing, in order to administer medication to the Respondent on an involuntary basis.  See, Government Exhibit 8.

- 13 -

The Due Process Hearing was conducted on May 10, 2007, before Donald Lewis, D.O. ("Dr. Lewis"), who is the Chief Psychiatrist at FMC-Rochester, and who served as the Independent Hearing Officer. <u>Id.</u> at 1. Dr. Lewis concluded that the Respondent suffered from a severe and persistent mental illness. <u>Id.</u> at 3. He observed that Dr. Bocanegra had opined that less restrictive treatment, including therapy and restraints, "would not improve [the Respondent's] severely decompensated mental status." <u>Id.</u> at 2. Dr. Lewis concurred with Dr. Bocanegra's treatment plan, and concluded that involuntary medication was both appropriate and necessary. <u>Id.</u> at 3.

On May 16, 2007, the Respondent was interviewed by Daniel J. Carlson, Psy.D. ("Dr. Carlson"), who is a staff psychologist at FMC-Rochester. See also, <u>Government Exhibit 9</u>. During his interview with Dr. Carlson, the Respondent reported a history of substance abuse. <u>Id.</u> at 2. Dr. Carlson also observed that the Respondent was not fully compliant with his medications, and that he had poor hygiene and compromised judgment. <u>Id.</u> at 1-2. Dr. Carlson confirmed the Respondent's diagnosis of Schizoaffective Disorder, Bipolar Type. <u>Id.</u> at 2. According to a master treatment plan dated May 17, 2007, the Respondent was prescribed antipsychotic medication and mood stabilizers, bi-weekly meetings with the psychiatrist, individual and group

therapy, activity therapy, and individual nursing contacts as needed, to monitor his medication compliance. See, Government Exhibit 2, at 118-121.

Although the Respondent later became more compliant with his medications, during its assessment, the Panel observed that he continued to exhibit severe symptoms of mood disturbance and psychosis, including delusions of persecution and grandeur. See, Government Exhibit 5, at 5; Government Exhibit 3, at 1, 9. He continued to inform staff that he owned the state of Delaware; that he was part of the Secret Service; that he "f[ought] thousands of men in his cell each night"; and that non-existent men in his cell "cut out my heart and cut off my penis last night." Id.; Government Exhibit 3, at 9. Staff at FMC-Rochester observed him yelling and "shadow boxing" through the night and, on one occasion, he demanded to be let out of his cell so he could "lay the night nurses." Id. at 6. On another occasion, he admitted having thoughts of wanting to harm others. See, Government Exhibit 3, at 9.

Dr. Simcox testified that while at FMC-Rochester, the Respondent has threatened to kill several staff members, and has pointed his index finger at staff members, to mimic "shooting" them. He further testified that the Respondent broke a food tray at FMC-Rochester, but turned the pieces over to medical staff, with

prompting.  Dr. Simcox reported that, while at FMC-Rochester, the Respondent has attempted to pull away from officers, while being escorted, and has thrown objects through the food slot.  Dr. Simcox testified that it was unclear whether the Respondent intended to harm anyone, through those actions.   However, he stated that the Respondent sometimes voices bizarre concerns -- that someone or something is trying to harm him.  As a result, Dr. Simcox testified that nurses at FMC-Rochester are very careful around the Respondent, and that the Respondent is often handcuffed to protect staff against any outburst.

During his personal interview with the Panel, the Respondent informed the Panel that "he was the Lieutenant Governor of Pennsylvania, a district attorney in Pennsylvania, and simultaneously held four 'police jobs,'" see, Government Exhibit 5, at 7, and that he would have to carry a weapon upon his release, in order to perform his job as a law enforcement officer.  Id. at 8.  He also stated that "he had been prescribed a special medication by a Princeton professor who created pills specifically for him," and that he would not accept any other medication.  Id.  Lastly, the Respondent advised the Panel that he had never been violent, and that he was wrongfully incarcerated.  Id.

In its Report, the Panel related that the Respondent gave an inconsistent personal history, with respect to substance use, at times stating that he had rarely consumed alcohol or drugs, and at other times reporting that he had a history of marijuana use, and had participated in a thirty (30) day substance abuse program.  Id. at 4; see also, Government Exhibit 2, at 132, 653-54, Government Exhibit 9, at 2.  The Panel recounted the Respondent's history of violent behavior, including his assault on the nurse at VA-Coatesville, as well as several incident reports during his Federal incarceration.  Id.  In addition, the Panel noted that the Respondent's mother obtained a Restraining Order against him in 2004, after he became destructive in her home, and that the Respondent's father had called the police on several occasions, in response to his psychotic and violent behavior.  Id. at 5.

Ultimately, in its Report, the Panel determined that the Respondent had a longstanding history of aggressive behavior, and that there was a "clear and direct relationship between [the Respondent's] psychotic symptoms and his episodes of aggression and threatening behaviors."   Id. at 8.   The Panel noted that the Respondent's "episodes of aggression and threatening behavior throughout his incarceration appear to have coincided with increases in his psychiatric symptoms." Id.  The Panel found that the Respondent was "grossly psychotic and unpredictable,"

and that he lacked a social support system.  Id. at 9.  As a result, the Panel concluded that, if released, the Respondent would pose a risk to those living with or near him, as well as individuals attempting to provide medical and mental health care services to him.  Id.

In an updated evaluation of January 3, 2008, John McKenzie, Psy.D. ("Dr. McKenzie"), who is a staff psychologist at FMC-Rochester, and Jennifer Kennedy, Psy.D. ("Dr. Kennedy"), who is a post-doctoral fellow at FMC-Rochester, observed that the Respondent continued to intermittently refuse his medications.   See, Government Exhibit 14, at 1.  In addition, in July and August of 2007, the Respondent received incident reports for throwing medication and water at staff, for cursing at staff, and for striking his food tray against his desk until it broke into pieces.  Id. at 2; see also, Government Exhibit 1, at 50-59.  The Respondent was found incompetent, and therefore, was determined to be not responsible for those incidents.  Id.

On several other occasions, between July and December of 2007, the Respondent was also observed responding to internal stimuli, cursing, yelling, and kicking, his cell door.  Id.  In December of 2007, he broke a food tray into pieces, and refused to hand over the pieces for approximately one (1) hour, although they were ultimately recovered without incident.  Id. at 2-3.  Dr. McKenzie and Dr. Kennedy

- 18 -

concluded that the Respondent's behavior remained unpredictable, and that he had not demonstrated that he could function in an open unit in a non-aggressive manner. Id. at 3-4.

At the Hearing, Dr. Simcox testified that he visits the Respondent weekly, in his cell, for a brief interaction, as part of his supervisory duties, and that he receives daily updates on the Respondent's condition, from nursing staff. Dr. Simcox attested that, throughout the course of his commitment at FMC-Rochester, the Respondent's diagnosis has not changed.[10] Although the Respondent's mood symptoms have improved over time, with greater impulse control, fewer episodes of sadness or anger, and lessened anxiety, Dr. Simcox testified that the Respondent continues to experience severe psychotic symptoms, including delusional thinking and hallucinations, despite his recent cooperation with his treatment plan.

Dr. Simcox attested that the Respondent is currently being treated with mood stabilizers, antipsychotic medications, and anti-anxiety medications, a treatment plan

---

[10]Dr. Simcox acknowledged that, during his years of treatment in the VA hospital system, the Respondent was diagnosed with Schizophrenia, Paranoid Type, which would include hallucinations and delusions, in the absence of mood instability. However, Dr. Simcox testified that the Respondent's diagnosis changed to Schizoaffective Disorder, Bipolar Type, during his confinement in the Bureau of Prisons system, based upon medical staff's observations of his depressive episodes.

which mirrors the mental health treatment the Respondent has received, through the VA hospital system, since the 1970s.  Dr. Simcox stated that, over time, those medications have become less effective for the Respondent, and accordingly, although the medications have relieved some of his symptoms, the Respondent's illness has not entered remission.  In addition, Dr. Simcox observed that, when the Respondent has been discharged from a hospital setting, he typically stops taking his medications, resulting in decompensation.

At the Hearing, Dr. Simcox further testified that, in his opinion, the Respondent currently suffers from a serious psychotic illness, that he cannot appreciate the consequences of legal proceedings, and that he is unlikely to improve to a state which would support his release into the community.  Dr. Simcox stated that he based his opinion upon the following information:  1) the Respondent's history of mental illness, particularly his hospitalizations over the preceding twenty (20) years; 2) the observations of prison medical staff at FDC-Philadelphia, FCI-Butner, and FMC-Rochester; 3) his ongoing contacts with the Respondent, during his commitment at FMC-Rochester; and 4) the Panel's interview of the Respondent.  Dr. Simcox further attested that he held his opinion to a reasonable degree of professional certainty, and that the medical staff of FMC-Rochester concurred with his diagnosis.

With respect to dangerousness, Dr. Simcox testified that, based upon his education and experience, he believed the Respondent's release would create a risk of injury to others, and Dr. Simcox testified that he held this opinion to a reasonable degree of professional certainty. Dr. Simcox explained that his opinion was based upon the history of the Respondent's mental illness, his history of violent behavior, his present mental status, his history of substance abuse, and his lack of resources or other support in the community. Dr. Simcox acknowledged that treatment compliance, as well as the Respondent's increasing age, would serve as mitigating factors, and he further acknowledged that the Respondent had not committed any recent acts of violence at FMC-Rochester. Dr. Simcox also acknowledged that the Respondent's medical record revealed no substance abuse in the past ten (10) to fifteen (15) years, although Dr. Simcox expressed concern that the Respondent would gain access to alcohol and other drugs, if he were released into the community, and that such chemical use would likely interfere with his mental health treatment. Nonetheless, on cross-examination, Dr. Simcox agreed that he, and the other Panel members, did not consider the Respondent's substance abuse to be a primary concern.

Dr. Simcox opined that, as of the date of the Hearing, the Respondent was experiencing active symptoms of his mental disorder, and that he showed limited

insight into his illness.  He further concluded that the Respondent's mental illness was far more severe than most of the other inmates at FMC-Rochester.   Dr. Simcox testified that, in his opinion, the Respondent's mental illness is the cause of his violent behavior, given that his past assaults have been unprovoked and illogical.  In addition, Dr. Simcox observed that the Respondent was found incompetent to proceed on the underlying Federal criminal charge, although he acknowledged that the Respondent, at one point, was found competent to enter a plea.  However, Dr. Simcox noted that, following several, more recent violent outbursts, the Respondent has been found to be not responsible for his actions, as a result of his active symptoms of mental illness.

In sum, Dr. Simcox opined that the Respondent requires the type of care which can be provided in a hospital setting, because of his active paranoia and delusional thinking.  Dr. Simcox testified that the Respondent is unable to care for himself, and that he quickly becomes noncompliant with his medication, when he is released from a hospital setting.  In fact, Dr. Simcox stated that the Respondent sometimes declines his medications at FMC-Rochester, but eventually accepts his medications if the staff members persist.  However, Dr. Simcox acknowledged that, in the few months preceding the Hearing, the Respondent had been more compliant with his treatment,

and that, as a result, the medical staff had not been required to use force, in order to administer the Respondent's intramuscular medications.   Compare, <u>Government Exhibit 2</u>, at Update pp. 5, 77, 94, 116, 1.  According to Dr. Simcox, the Respondent has been permitted to request several medications, so as to relieve agitation and insomnia, on an as-needed basis.

On cross-examination, Dr. Simcox acknowledged that many of the Respondent's prior hospitalizations, in the VA hospital system, had been voluntary, rather than involuntary, and that he had successfully lived in a group home, for approximately four (4) years in the late 1990s.  He also acknowledged that the SHU at FMC-Rochester is not an "ideal" place for a person with active Schizoaffective Disorder, and that placement at a VA hospital would be preferable.

At the Hearing, the Government also adduced the testimony of Pamela J. Seebach, LICSW ("Seebach"), who is a Board-certified clinical social worker at FMC-Rochester.  See, <u>Government Exhibit 10</u>.  Seebach testified that she prepared a psychosocial assessment of the Respondent, based upon a personal interview, as well as a review of his medical records.  See, <u>Government Exhibit 11</u>.  Seebach testified that the Respondent made several comments, during the course of his interview, which reflected ongoing psychosis, including grandiose and delusional thoughts.  For

example, the Respondent advised that he had been married "but not on earth," that he communicated with his family telepathically, that he is a private detective, that he has a law degree from Harvard University, and that he invented astrophysiology.  Id. at 1-2.  The Respondent also told Seebach that he would "hurt anyone he needed to, to avoid dying" at FMC-Rochester, and that he "was sent here to be used to corrupt this place."  Id. at 3.

Seebach further testified that she has attempted to find a suitable State placement for the Respondent, in his home State of Pennsylvania, by contacting the Interstate Compact Coordinator for that jurisdiction.  See, Government Exhibit 12.  However, Seebach attested that the State hospital system in Pennsylvania has exercised its right to deny the admission of patients, who seek to transfer from the Federal prison system.  See, Government Exhibit 1, at 163.  Seebach explained that, if a State's laws do not require it to accept a prisoner from a Federal prison, then that State has a right to deny placement.  Accordingly, Seebach testified that placing the Respondent in a State hospital, in Pennsylvania, is not a possibility, pursuant to that jurisdiction's current policy.

Seebach testified that she next contacted VA-Coatesville, given the Respondent's history of care, and given that his veteran status would qualify him for

treatment through the VA hospital system.   See also, <u>Government Exhibit 12</u>. Seebach attested that Theodore S. Nam, M.D., who is Chief of Psychology at VA-Coatesville, informed her that the Respondent is "banned" from that facility, due to his history of "violent and assaultive behaviors towards [sic] its staff and patients." <u>Government Exhibit 13</u>.   Accordingly, VA-Coatesville advised Seebach that it would not accept the Respondent for treatment either directly from FMC-Rochester, or indirectly through a transfer from another VA hospital.   On cross-examination, Seebach stated that she did not know whether the VA-Coatesville "ban" could be challenged by any process.

Next, Seebach contacted several other VA hospitals, without any success.  The VA hospital in Philadelphia ("VA-Philadelphia") advised that it would not accept a patient who transferred directly from FMC-Rochester; instead, it referred Seebach back to VA-Coatesville.  The VA hospitals in Lebanon, Maryland ("VA-Lebanon"), and Wilkes-Barre, Pennsylvania ("VA-Wilkes-Barre") advised that they only provide acute and short-term care, rather than the long-term care required by the Respondent. The VA hospitals in Minneapolis, Minnesota ("VA-Minneapolis"), St. Cloud, Minnesota ("VA-St. Cloud"), and Perry Point, Maryland ("VA-Perry Point"), advised that they would not accept a patient with any pending Federal charges.  Seebach

attested that FMC-Rochester has no authority to require any State or a VA facility to accept the Respondent for treatment. However, Seebach stated that, if the present Petition were granted, and the Respondent were committed to FMC-Rochester, then she would continue to actively seek a suitable State placement, as required by Title 18 U.S.C. §4246(d).

At the Hearing, the Respondent did not offer any exhibits, call any witnesses, or testify. However, through his counsel, the Respondent expressed to the Court his desire to be treated in a hospital, either in Pennsylvania, or elsewhere on the East Coast, in order to be closer to his family.

## III.  Discussion

A.    Standard of Review. Title 18 U.S.C. §4246 "provides for the indefinite hospitalization of a person who is due for release but who, as the result of a mental illness, poses a significant danger to the general public." United States v. Williams, 299 F.3d 673, 676 (8th Cir. 2002), quoting United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997), cert. denied, 523 U.S. 1011 (1998), citing United States v. Steil, 916 F.2d 485, 487 (8th Cir. 1990), citing, in turn, United States v. Gold, 790 F.2d 235, 237 (2nd Cir. 1986). In such a proceeding, the Government bears the burden of proving,

by clear and convincing evidence,[11] 1) that the person "is presently suffering from a mental disease or defect," 2) that, as a result, "his release would create a substantial risk of bodily injury to another person or serious damage to property of another," and 3) that "suitable arrangements for State custody and care of the person are not available." Title 18 U.S.C. §4246(a), (d); see also, United States v. Williams, supra at 676 ("[T]he statute requires a direct causal nexus between the mental disease or defect and dangerousness."); United States v. S.A., supra at 998, 1000; United States v. LeClair, 338 F.3d 882, 884-85 (8th Cir. 2003), cert. denied, 540 U.S. 1025 (2003); United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994), cert. denied, 513 U.S. 1064 (1994).  If the Government meets its burden, then the Court must commit the person to the custody of the Attorney General.  See, Title 18 U.S.C. §4246(d).

"Section 4246 is specifically designed to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees." United States v. S.A., supra at 999, citing United States v. Moses, 106 F.3d 1273, 1280 (6th Cir. 1997). Nonetheless, "[b]y its own terms, section 4246 applies only in those unique situations where suitable arrangements for state care and custody are unavailable." Id. at 1000.

---

[11]Clear and convincing evidence is something more than proof by a preponderance of the evidence, but less than proof beyond a reasonable doubt.  See, Addington v. Texas, 441 U.S. 418, 429 (1979).

"Thus, civil commitment under section 4246 occurs 'only in those rare circumstances where a person has no permanent residence or there are no State authorities willing to accept him for commitment.'" Id., quoting H.R. Rep. No. 98-1030, at 250 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3432.

B.     Legal Analysis.  With respect to the first prong of Section 4246, we find no serious dispute in the Record that the Respondent is presently suffering from a mental disease or defect -- namely, Schizoaffective Disorder, Bipolar Type.  Each of the physicians who examined the Respondent, during his incarceration at FDC-Philadelphia, FCI-Butner, and FMC-Rochester, confirmed this diagnosis.  See, United States v. Lewis, 929 F.2d 440, 441-42 (8th Cir. 1991)(affirming the District Court's conclusion, that the respondent's diagnosis of Schizoaffective Disorder, Bipolar Type, constituted a mental disease or defect under Section 4246); see also, United States v. Khatib, 17 Fed.Appx. 486, 486 (8th Cir. 2001)(noting the respondent's concession, that his Schizoaffective Disorder satisfied the first requirement of Section 4246).

Notably, the Respondent has not produced any medical evidence, or any medical opinion, to challenge that diagnosis.  See, United States v. Steil, supra at 488 ("At least five mental health professionals have found [the respondent] mentally ill and dangerous, and there is no medical opinion to the contrary in the record before

us."); see also, United States v. Cann, 114 Fed.Appx. 763, 764 (8th Cir. 2004) and United States v. Williams, 28 Fed.Appx. 618, 619 (8th Cir. 2002)(citing same). Accordingly, we find that the Government has presented clear and convincing evidence that the Respondent is currently suffering from a mental disease or defect.

Based upon our review of the written record, and upon the testimony presented at the Hearing, we find next that the Government has shown by clear and convincing evidence that the Respondent's release would create a substantial risk of bodily injury to another person, or serious damage to the property of another person. In United States v. Ecker, supra at 970, our Court of Appeals suggested several factors for determining dangerousness, including "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incidents manifesting dangerousness, and a history of problems taking prescribed medicines." See also, United States v. Chairse, 18 F. Supp.2d 1021, 1029 (D. Minn. 1998)(citing same).

Here, the Government has presented ample evidence of the Respondent's past violent outbursts, including numerous incident reports during his hospitalizations at VA-Coatesville, and during his Federal incarceration, as well as his unprovoked assault on a VA nurse, which resulted in serious injuries. Admittedly, Dr. Simcox

testified that the Respondent's substance use was not a primary concern for the Panel. However, with respect to weapons, Dr. Simcox related the Respondent's attempt to use the shards of a food tray as a weapon, in assaulting an officer, and he further attested that the Respondent had advised the Panel of his intent to carry a weapon, should he be released, in order to perform his duties under a delusion that he was a law enforcement official. Dr. Simcox further attested that, because of the Respondent's size, he was able to inflict serious injuries on the VA nurse, by using only his fists. In addition, the record reveals that the Respondent requires the focused and persistent efforts of staff at FMC-Rochester, to maintain compliance with his regimen of medications.

Accordingly, the majority of the factors identified by the <u>Ecker</u> Court support our conclusion that the Respondent would pose a danger to others, if released from custody. Moreover, the Record reveals that the Respondent suffers from near-constant delusions and hallucinations, and that he has both threatened and behaved violently toward staff at VA-Coatesville, and at FMC-Rochester, on more than one occasion. Compare, <u>United States v. Cann</u>, supra at 764 (affirming a finding of dangerousness, where "the mental professionals here * * * unanimously believed Cann's release would be dangerous, given his unrelenting delusions and related threats of violent

behavior, with medication never having resulted in a complete remission of symptoms[.]")[citations omitted]; United States v. Williams, supra at 677 (finding that "periods of Williams' incarceration, as recounted at the hearing, were marked by significant episodes of bizarre, defiant and explosive behavior," and holding that "[t]he experts, and the district court, were entitled to consider the risk of dangerousness in light of Williams' entire behavioral and psychological profile, not just its most recent manifestation."); United States v. S.A., supra at 1001 ("Although medication is helpful in controlling S.A.'s condition, there is evidence that S.A. has shown a reluctance to continue medication on his own volition," and "[t]he violent nature of S.A.'s visual and auditory hallucinations and his actual prior violent behavior are sufficient to support a finding that he is dangerous."); United States v. Ecker, supra at 970 (affirming finding of dangerousness, notwithstanding the respondent's assertion that his "last assault occurred over ten years ago, and that [he] had not assaulted anyone during his three years in confinement."); United States v. Steil, supra at 487-88 (affirming commitment, and noting physician's opinion that the respondent "was dangerous because he confused his hallucinations and delusions with the events around him and responds to them as if they are real.").

We acknowledge the Respondent's assertion that, in the few months immediately preceding the Hearing, he became more compliant and cooperative, particularly with respect to accepting his medications. However, that recent improvement does not negate our finding of dangerousness, in light of the totality of the Respondent's history. See, United States v. Williams, supra at 677 ("Williams' more recent behavior may merely reflect an adjustment to the strictly controlled correctional environment."); United States v. S.A., supra at 1001 ("Although S.A. argues that his recent behavior has been vastly improved, that fact alone does not require a finding that S.A. is not dangerous," given that "S.A. has spent most of his time at FMC-Rochester in isolation and has therefore had minimal contact with others and, consequently, minimal opportunity to engage in violent behavior.").

Moreover, Dr. Simcox attested that, in his professional view, the Respondent's medications had grown less effective over time, given the duration of his mental illness, and he further attested that, despite treatment, the Respondent continued to experience delusions and hallucinations, without any remission. Dr. Simcox also testified that although the Respondent can identify his mental health issues, he has showed little insight into the necessity of his medications and other treatment.

Further, we are persuaded that the Respondent's dangerousness is the result of his Schizoaffective Disorder. In its Report, the Panel concluded that the Respondent's violent and aggressive behavior coincided with increases in his psychiatric symptoms. In addition, Dr. Simcox testified that the Respondent's violent behavior was often unprovoked, and that the Respondent has not been held responsible for numerous incident reports, during his Federal incarceration, because of his active symptomatology. See, United States v. S.A., supra at 1001 (holding that testimony that "S.A.'s dangerousness was 'directly connected' with his mental illness and that his condition was a 'significant factor' contributing to his violent behavior" was "more than sufficient to support a finding that S.A.'s dangerousness was a result of his mental condition."); United States v. Reynolds, 163 Fed.Appx. 436, 436 (8th Cir. 2006)(affirming commitment, and observing that "the experts who examined [the respondent] unanimously believed * * * that he would continue to engage in threatening behavior if unconditionally released, based on [his] delusions and past threatening behavior").

In addition, in its Report, the Panel concluded that the Respondent lacked any social support system which would ensure his compliance with medication, and there is nothing in the Record to suggest that the Respondent would be subject to any type

of supervision if released, given that he has never been sentenced for the underlying offense, and given that he has now served more time than any potential sentence. Cf., United States v. Chairse, supra at 1031-32 (observing that the respondent would be subject to supervised release conditions, including participation in a mental health aftercare program, and a substance abuse aftercare program, under supervision by a United States Probation Officer). Accordingly, we find nothing in the Record to rebut a finding of dangerousness, nor has the Respondent produced any evidence or argument which would refute such a conclusion. Therefore, we find that the Government has satisfied its burden with respect to the second prong of Section 4246.

Lastly, with respect to the third prong of Section 4246, the Government has shown that no suitable State placement is currently available for the Respondent. Through her testimony, Seebach described her extensive efforts to secure a place at a State hospital in Pennsylvania, or at a VA hospital in a number of different States, but without any success. The State of Pennsylvania currently refuses to accept any patients transferring from Federal facilities, and VA-Coatesville has specifically refused to accept the Respondent as a patient. See, Title 62 Pennsylvania Statutes §1121, Article III(c) ("No state shall be obliged to receive any patient * * * unless the receiving state shall agree to accept the patient."); see also, United States v. Ecker, 489

F. Supp.2d 130, 137 (D. Mass. 2007)(acknowledging that "the Interstate Compact relieves a state from any obligation to receive a patient if it does not agree to accept him," but observing that the Attorney General's duty to "exert <u>all reasonable efforts</u> to persuade and to cause the [State] to assume responsibility" continues during the pendency of the commitment, and concluding that submitting only two (2) reports in six (6) years failed to fulfill that duty)[emphasis in original].

Again, even though we recognize that the burden of proof belongs to the Government, the Respondent has not made any showing which would refute Seebach's testimony, or would show that her efforts have not been exhaustive.  Cf., <u>United States v. Chairse</u>, supra at 1033 (concluding that the Government had failed to sustain its burden, because " [a] waiting list [for a State in-patient facility] exists in this case, which shows that state placement was a possibility, although not an immediate possibility.").  We acknowledge the Respondent's desire to receive treatment in a facility that is closer to his family, "but we recognize that such a placement depends upon finding a state institution that is willing to accept [him]." <u>United States v. Steil</u>, supra at 488.

Accordingly, we find that the Government has shown, by clear and convincing evidence, that no suitable State placement is currently available for the Respondent.

Nonetheless, we reiterate that the Government will be subject to a continuing duty to seek a suitable State placement for the Respondent, see, <u>Title 18 U.S.C. §4246(d)</u>, and based on the representations made at the Hearing, we understand that the Government is cognizant of the Respondent's desire to seek a placement in the State of Pennsylvania.

In sum, we find and conclude that the Government has sustained its burden under Title 18 U.S.C. §4246, and therefore, we recommend that the Government's Petition to Determine Mental Condition be granted, and that the Respondent be committed to the care and custody of the United States Attorney General.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Petition to Determine Present Medical Condition of an Imprisoned Person under Title 18 U.S.C. §4246 [Docket No. 1] be granted.

- 36 -

2.     That the Respondent be committed to the custody of the United States Attorney General, who shall hospitalize him for treatment and care at FMC-Rochester until a suitable State placement can be found, or until the Respondent's release no longer constitutes a substantial risk of bodily injury to another person or serious damage to the property of another.

Dated: May 29, 2008                              s/Raymond L. Erickson
                                                 Raymond L. Erickson
                                                 CHIEF U.S. MAGISTRATE JUDGE

### N O T I C E

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 13, 2008,** a writing which specifically identifies those portions of the Report to which objections are made and the bases for those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of the Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 13, 2008,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.